ERIC S. OLSON (#11939)
LENA DAGGS (#13666)
**EISENBERG GILCHRIST & CUTT**
900 Parkside Tower
215 South State Street
Salt Lake City, Utah 84111
Phone: (801) 366-9100
Facsimile: (801) 350-0065
eolson@egclegal.com
ldaggs@egclegal.com

TYLER J. BROWN, ESQ. #15555
**NUTTALL, BROWN & COUTTS**
6925 Union Park Center, Suite 210
Midvale, Utah 84047-4198
Phone: (801) 255-2102
Facsimile: (801) 255-2032
tylerbrown@nuttallbrown.com
briancoutts@nuttallbrown.com

*Attorneys for Janet Wagner*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LIFE INSURANCE COMPANY OF NORTH AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CONRAD TRUMAN, by and through his agent with Power of Attorney COLETTE DAHL, and JANET WAGNER,<br><br>Defendants. | **JANET WAGNER'S MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>**Oral Argument Requested**<br><br>Case No. 2:15-CV-00505-BSJ<br><br>The Honorable Bruce S. Jenkins |

Janet Wagner, by and through counsel of record, hereby submits her memorandum in opposition to Conrad Truman's motion for summary judgment.

## INTRODUCTION

The Court should deny Conrad's motion. Conrad moved to dismiss his criminal case multiple times because he believed the evidence was insufficient for a jury to conclude beyond a reasonable doubt that he murdered Heidy. The trial court denied Conrad's motions before his first trial, after a new trial was granted based on a change in evidence and during the second trial when the State rested. It did this because the evidence was sufficient for a reasonable jury to conclude, beyond a reasonable doubt, that Conrad killed Heidy.

In the case at hand, Janet Wagner ("Janet") only has to prove that Conrad recklessly caused Heidy's death by a preponderance of the evidence. The evidence was sufficient for Conrad to be tried twice on more demanding charges, beyond a reasonable doubt. It is clearly sufficient for him to be tried in this case, by a preponderance. This is especially true since in the case at hand, Janet has even more evidence. Janet has retained an expert that the State did not have and Janet has been able to take Conrad's deposition after everything that has happened.

As further evidence that a jury question exists, two different juries in the criminal case reached two different results. While there were some differences in the evidence presented, the basic facts were the same and two different results were reached.

Apart from prior rulings and prior jury verdicts, the facts show there is an issue of fact as to whether Conrad killed Heidy. It is undisputed that either Conrad shot Heidy or Heidy committed suicide. There is no reason to believe that Heidy would commit suicide. Conrad himself has said this repeatedly. Everyone else who knew Heidy agrees. The facts they attest to

support this.  Further, Heidy was not intoxicated, on drugs or mentally ill.  And she was shot while she was standing or walking completely naked in the kitchen.

Conrad on the other hand, was in a fit of rage at the scene and on the 911 call.  He was screaming, swearing and making death threats to everyone who tried to help, including the 911 operator.  He was also very intoxicated.  He has made repeated inconsistent statements about the night of the incident that make his claim of suicide and denial of murder, unbelievable.  As a result, an issue of fact exists as to whether Conrad shot Heidy.

Finally, analogous case law from Utah and elsewhere make clear that the evidence in this case is sufficient for a reasonable finder of fact to conclude that Conrad shot Heidy.  As a result, summary judgment must be denied.

## STATEMENT OF ADDITIONAL MATERIAL FACTS[1]

### Heidy's Death

1.  Heidy died from a gunshot wound to the head while in her home.  *See* Leis, 2nd Trial, Volume VII, p. 39 – Ex. A.[2]  The wound was a contact gunshot wound, which means the barrel of the gun was pressed hard against the scalp of Heidy's head when she was shot. *Id.* at 30 and 37-38 – Ex. A.[3]  Here is a photo of the wound:

---

[1] The instant brief cites to prior trial testimony from both Conrad Truman's criminal trials.  This trial testimony is admissible as a hearsay exception pursuant to Fed. R. Civ. P. 32 and Fed. R. Evid. 804, because the testimony is offered against Conrad who has already had the opportunity to confront the declarants and challenge the testimony under cross-examination in actions involving the same subject matter at issue here.

[2] Dr. Leis is a forensic pathologist. *Id.* at 7 – Ex. A.  Since 1990, he has worked as a medical examiner. *Id.* at 8 – Ex. A.  As medical examiner, he determines the cause of death in the State of Utah when someone passes away. *Id.* Conrad's counsel stipulated at trial that Dr. Leis is clearly qualified to testify as an expert in this case. *Id.*

[3] Dr. Leis testified that the triangular shape of the wound shows it was a contact gunshot wound because the increased pressure from the barrel being pressed against the skin causes wounds to be atypically shaped "instead of a nice round circle." *Id.* at 30-31 – Ex. A.  He also explained that discoloration around the wound and around the hole in her skull indicate that soot or smoke came out of the end of the barrel and deposited on Heidy's scalp and skull. *Id.*

3



2. The only two people in the home when Heidy was shot were Conrad and Heidy. See Conrad Depo. at 257 – Ex. B. Conrad admitted at his deposition that either he shot Heidy or Heidy shot herself.

> Q.   It was you or her.
> A.   Correct. Yes.

*Id*. He admitted that no one else shot Heidy. *Id*.

### The 911 Call

3. On Sunday, September 30, 2012, Conrad called 911 at 10:59 p.m. Phone Log – Ex. C. Conrad was screaming. *See* Patten, 2nd Trial, Vol. I, p. 101 – Ex. D. Among other things, Conrad swore "to God" that he would "fucking kill" the dispatcher and "blow [her] fucking head." *See* Dispatch Transcript, 1st Trial, Vol. II, pp. 3-4 – Ex. E. For the

most part, Conrad did not answer the dispatcher's questions or comply with her requests. *See* Patten at 94-95 – Ex. D. The dispatcher was unable to understand much of what Conrad said. *Id.* at 99-100 – Ex. D.

### The police response

4. Law enforcement entered the home within minutes of the 911 call. *See* Elias, 2nd Trial, Vol. I, pp. 112-113 – Ex. D. Below is a diagram of the home



5. Law enforcement saw Heidy laying on the kitchen floor, completely naked, with a large pool of blood around her. *See* Elias at 112-113 – Ex. D. Her head was near the top of the

stairs. *See* Crook, 2nd Trial, Vol. II, p. 16 – Ex. F. Her legs were pointed away from the stairs, toward the hallway. *Id.* at 16-17 – Ex. F. Below is a photo of the kitchen floor, at the top of the stairs, after Heidy was taken away.



6. Conrad told the officers not to touch Heidy because they were not medical. See McKown. 2nd Trial, Vol. II, pp. 188-189 – Ex. F. The officers told Conrad that they needed to secure the scene before medical enters the home. *Id.* Conrad screamed at the officers and threatened to kill them if they did not hurry up. *See* Elias at 113-114 – Ex. D.

7. The officers tried to get Conrad to back away from Heidy because paramedics were there and ready to help her. *See* Crook at 26 – Ex. F. Conrad told the officers he would "fucking kill" them if Heidy died. *See* McKown at 190 – Ex. F.

8.  Conrad was swearing a lot, in a state of rage. *See* Crook, at 27 and 29 – Ex. F. He
    pointed at one officer and yelled with fury that he would kill the officer and everyone the
    officer knows. *Id.* The officer believed Conrad was serious. *Id.* Conrad had blood all
    over his hands and arms. *Id.* at 58-59 – Ex. F. Conrad appeared intoxicated. *Id.* at 100 –
    Ex. F. Conrad had alcohol on his breath. *See* Lopez, 2nd Trial, Vol. IV, p. 192 – Ex. G.

9.  The officer speaking to Conrad noticed a gun on the kitchen floor, next to Conrad's foot.
    *See* Crook at 29 – Ex. F.[4] The hammer was cocked. *See* Lopez at 187 – Ex. G. The
    officer was scared that Conrad would pick up the gun in his mental state. *See* Crook at
    31 – Ex. F. To avoid escalating the situation further, the officer slid the gun away from
    Conrad with his foot. *Id.* at 31-32 – Ex. F.

10. The officer saw another gun in a holster on the kitchen table. *Id.* at 34-35 – Ex. F.
    Conrad picked it up and yelled at it, verbalizing how much he hated the gun. *Id.* Then he
    threw it against the wall.[5] *Id.*

11. When the paramedics entered the kitchen, Conrad threatened to kill them if they did not
    save his wife. *See* Sneddon, 2nd Trial, Vol. III, p. 76 – Ex. I. Conrad was hostile and
    belligerent toward them. *Id.* at 99 – Ex. I. Conrad's threats made the scene chaotic and
    put emergency personnel on edge. *See* Livingston, 2nd Trial, Vol. III, pp. 135, 139 and
    170-171 – Ex. I.

---

[4] The gun on the floor had a black handle. *Id.* at 39 – Ex. F. Conrad had purchased the gun for Heidy. See Conrad Depo. at 118 – Ex. B. It was eventually shown that Heidy was shot with the black handled gun. *See* Bechaver, 2nd Trial, Vol. IX, p. 161 – Ex. H.

[5] This gun had a silver handle. *Id.* at 40-41 – Ex. F. The silver-handled gun belonged to Conrad. *See* Conrad Depo. at 118 – Ex. B.

12. The officers had Conrad go to the living room, so the paramedics could work. *See* Crook at 54 – Ex. F. When Conrad was not permitted by an officer to go back into the kitchen, he took a fighting stance and threatened to kill the officer and punch him in the face. *See* Ferre, 2nd Trial, Vol. III, pp. 8-9 – Ex. I.

13. Conrad explained that he was sitting at the kitchen table, Heidy came out of the bathroom, he heard a "pop" and Heidy fell to the ground. *See* Crook at 48-49 – Ex. F. Conrad suggested to the officers that Heidy was possibly murdered. *See* McKown at 193 – Ex. F. An officer checked the home and confirmed that no one else was there. *Id.* at 193-197 and 208 – Ex. F.

14. Conrad also suggested to the officers that somebody possibly shot Heidy from outside while she was in the bathroom. *See* Crook at 51 and 104 – Ex. F. An officer checked the bathroom and saw that the window was closed and there were no bullet holes through the window or walls. *Id.* at 51 – Ex. F.

15. A Victim's Advocate was called to the scene for Conrad at about 11:20 p.m. *See* Flitton, 2nd Trial, Vol. IV, p. 115 – Ex. G. She tried to calm him down, so he could go see Heidy at the hospital. *Id.* at 118 – Ex. G. Conrad got in her face, close to her nose, and questioned whether she had ever lost anybody. *Id.* at 121 – Ex. G. He had a mean look on his face. *Id.* The Victim's Advocate thought Conrad was going to hit her. *Id.* She feared for her safety. *Id.*

### The hospital

16. Conrad eventually went to the hospital with the Victim's Advocate and an officer. *Id.* at 123 – Ex. G. On the drive to the hospital, Conrad told the officer: "I think something

shot her … because she would never shoot herself." *See* Vehicle Audio Recording, 1st Trial, Vol. V, p. 1 – Ex. J.

17. When they got out of the car, Conrad grabbed the Victim's Advocate by the arm and said "we need to find out who shot my wife." *See* Flitton at 123 – Ex. G. He commented that Heidy may have been shot through the window. *Id.* at 124 – Ex. G.

## Police Interview of Conrad

18. After seeing Heidy at the hospital, law enforcement interviewed Conrad. *See* Flitton at 175 – Ex. G. He told the officers that Heidy's "got no suicidal tendencies." *See* Hospital Interview Transcript at 11 – Ex. K. She showed no signs of suicide. *Id.* at 19 – Ex. K. Heidy never talked about harming herself. *Id.* at 15 – Ex. K. She was not on any medication. Id. at 16 – Ex. K. There was nothing going on that she was upset about. *Id.* at 11-12 – Ex. K. When the officers asked whether Heidy was depressed, Conrad said: "No she's not. Not any of that … Never." *See* Station Interview Transcript at 11 – Exhibit L.

19. Conrad repeatedly told the officers that Heidy would never hurt herself. *See* Hospital Interview Transcript at 11-12 – Ex. K; and Conrad Depo. at 256 – Ex. B. Conrad said emphatically:

> She'd never fucking harm herself. Never. … She's so fucking tough. She's so fucking tough. She- she's just- she's the epitome of tough, she's always telling me to be better and do stuff better and be a better person. She's a tough woman. She's a good woman. I love her so much. She'd never hurt herself. She'd never fucking hurt herself.

*See* Hospital Interview Transcript at 16 – Ex. K.

20. He said the officers were "totally desensitizing" Heidy's "fucking-murder." *Id*. at 15 –
    Ex. K. He said: "We need to find the fucking real killer out there all right?" Id. at 19 –
    Ex. K. He thanked one of the officers for responding to Heidy's "murder." *See* Crook at
    72 – Ex. F.

### After the incident

21. Eight days after the incident, Conrad told one of Heidy's friends: "All I can think it could
    be is an accident because we were so happy." *See* Facebook Messages – Exhibit M.
    That same day, Conrad told another friend: "It was a complete freak accident[.]" *Id*.

22. That same month, Conrad told law enforcement that he thought Heidy's death "was an
    accident." *See* Phone Call Recording, 1st Trial, Vol. X, p. 3 – Ex. N.

### Insurance Claims

23. When Conrad returned to work after the incident, he asked his benefits administrator for
    insurance forms to fill out related to Heidy's death. *See* Naccarato, 2nd Trial, Vol. X, p.
    117 – Ex. O. The administrator did not give Conrad the forms because he did not have
    the required documentation, like an autopsy report. Id. at 118 – Ex. O. Conrad asked
    three times for the forms and was told the same thing each time. *Id*. at 118 and 138 – Ex.
    O.

24. Conrad's benefits administrator eventually gave him the forms to fill out because he had
    been asking and the police suggested it. *Id*. Conrad completed two insurance claim
    forms for two different policies. *See* Claim Forms – Exhibit P; and Conrad Depo. at 260
    – Ex. B. Conrad knew when he completed the forms that they were for "accidental"
    death insurance. *See* Conrad Depo. at 270. The policies had suicide exclusions. *See*

Naccarato at 138 – Ex. O. Conrad knew that making fraudulent insurance claims was a crime. *See* Conrad Depo. at 265 – Ex. B. As a result, he wanted to be completely accurate when he filled out the forms. *Id.* In the portions of the forms that asked about what happened, Conrad wrote: "Our home, accident with a firearm" and "At our home, accidental discharge of a firearm." *See* Claim Forms – Exhibit P.

25. Conrad testified that at the time of Heidy's passing, his understanding was that he would get about $300,000 of insurance benefits if Heidy died. *See* Conrad Depo. at 264 – Ex. B. In reality, there is over $500,000 of insurance available because of Heidy's death. *See* Two Interpleader Complaints – Ex. Q.

## Criminal charges

26. Conrad was charged with Murder and Obstructing Justice. *See* First Verdict Form – Exhibit R. At the first trial, Conrad's counsel stated during opening statements that he did not think Heidy intentionally killed herself. *See* Conrad Depo. at 252 – Ex. B. Conrad testified at his first trial that he did not believe Heidy would intentionally shoot herself. *Id.* at 256 – Ex. B. Conrad's attorney argued that Heidy's death was an accident. *Id.* at 282 – Ex. B. Conrad was convicted on both counts at the first trial. *See* First Verdict Form – Exhibit R.

27. After the first trial, Conrad obtained new counsel. *See* Conrad Depo. at 255 – Ex. B. Conrad formed the belief that Heidy probably shot herself intentionally. *Id.* at 252 and 254. At the second trial, Conrad argued, through his attorneys, that Heidy's death was a suicide. *Id.* at 282 – Ex. B. Conrad was acquitted by the second jury. *See* Second Verdict Form – Ex. S.

28. Conrad is unsure whether he intends to bring a legal malpractice claim against his first criminal attorney. *See* Conrad Depo. at 256 – Ex. B.

## Conrad's Current Position

29. Conrad testified at his deposition that he believes Heidy committed suicide. *Id.* at 17 – Ex. B. He testified that if he were filling out the insurance claim forms today, he would write that Heidy's death was a suicide rather than an accident. *Id.* at 267 – Ex. B. Notwithstanding, he has never gone back to the insurers and told them he believes Heidy's death was a suicide. *Id.* at 256 – Ex. B. If he wins this case, he intends to accept the insurance proceeds even though the policies have exclusions for suicide. *Id.* at 272 – Ex. B; and Insurance Policy Exclusions – Ex. CC.

30. Conrad also testified that he would retract his numerous statements to the police that Heidy would never hurt herself. *See* Conrad Depo. at 277-278 – Ex. B. However, he would not retract his statement to the police that he would never hurt Heidy. *Id.*

## Suicide

31. People who commit suicide usually do it while alone. *See* Korbanka, 2nd Trial, Vol. IX, p. 193 – Ex. H.[6] Men usually use more lethal means than women. *Id.* at 194-195 – Ex. H. People who commit suicide usually flirt with suicide beforehand. *Id.* at 190 – Ex. H. They usually self-harm before attempting suicide. *Id.*

---

[6] Dr. Korbanka is the executive director of Wasatch Mental Health ("WMH"). *Id.* at 173 – Ex. H. WMH is the mental health authority for Utah County. *Id.* Dr. Korbanka has been with WMH for over 22 years. *Id.* He has a Ph.D. in psychology. *Id.* at 176 – Ex. H. He has been teaching graduate level psychology for 20 years. *Id.* at 177 – Ex. H. He has clinical experience with suicide, teaching experience with suicide and experience in suicide prevention. *Id.* at 181-182 – Ex. H.

32. Having friends, strong family relationships and a positive work environment are all protective factors against suicide. *Id*. at 212 and 223-224 – Ex. H.

33. Having mental illness is a risk factor for suicide. *Id*. at 196 – Ex. H. Drug, alcohol and medical use are a risk factor for suicide. *Id*. at 193 – Ex. H. Dr. Korbanka has never seen a case of suicide where the person did not have any risk factors. *Id*. at 196 – Ex. H.

### Heidy

34. According to Conrad, Heidy was upbeat, outgoing and full of life. *See* Conrad Depo. at 15 – Ex. B. She was not crazy. *Id*. Heidy never showed any signs of depression. *Id.* at 16 – Ex. B. She never received therapy or counseling. *Id.* at 22 – Ex. B. Heidy never took medication for depression or anxiety. *Id.* at 23 – Ex. B. She never threatened or talked about killing herself. *Id.* at 98 – Ex. B.

### Conrad's relationship with Heidy, according to Conrad

35. Conrad and Heidy had been married for over three years when she died. *Id.* at 15 – Ex. B. Conrad claims that he never yelled at Heidy. *Id.* at 33 – Ex. B. He claims that she only yelled at him once, when he made a sarcastic remark. *Id.* at 33-35 – Ex. B. Conrad claims that they never yelled at each other while someone was mad. *Id.* at 33 – Ex. B.

36. Conrad claims that there was never any ongoing issues that they disagreed about. *Id.* at 35 and 45 – Ex. B. There was no subject that they had repeated disagreements about. *Id.* at 45 – Ex. B. He claims they never had a fight that wasn't just a disagreement. *Id.* at 36 – Ex. B.

37. Conrad claims that they did not have any marital problems that were out of the ordinary. *Id.* at 52 – Ex. B. They were not a fighting couple. *Id.* at 43 – Ex. B. They never had any "bid-deal fights." *Id.* at 43-44 – Ex. B.

38. Conrad claim that he was never controlling of Heidy. *Id.* at 51 – Ex. B. He was never jealous. *Id.* at 59 – Ex. B. He never accused her of being unfaithful. *Id.*

39. Conrad testified that he never abused Heidy in any form. *Id.* at 52 – Ex. B. He did not call her derogatory names. *Id.* at 55-56 – Ex. B. He does not remember swearing at Heidy in a hurtful way. *Id.* at 95 – Ex. B. He denies saying anything to her that was intentionally belittling or insulting. *Id.* at 96 – Ex. B. Conrad claims that he never wanted to hurt Heidy's feelings. *Id.* at 96-97 – Ex. B. Although Conrad had active prescriptions for pain medication that he took every day, Conrad denies that he had any addiction. *Id.* at 113-114 – Ex. B. Conrad watched crime television shows, but claims he only watched them because Heidy wanted to and he liked cuddling with her. *Id.* at 168 – Ex. B.

40. Conrad never thought Heidy had depression. *Id.* at 16 – Ex. B. Conrad never recommended that Heidy see a counselor because he never thought she needed it. *Id.* at 22-23 – Ex. B. Conrad did not believe she needed medication. *Id.* at 23 – Ex. B.

41. Conrad claims he and Heidy were going to have kids at some point. *Id.* at 53-54 – Ex. B. The did not have any disagreement about kids. *Id.* at 54 – Ex. B

42. Conrad claims that they made love at least once a week. *Id.* at 99 – Ex. B. Conrad was never unfaithful to Heidy and she was never unfaithful to him. *Id.* at 32 – Ex. B.

43. Conrad claims that they never argued about sex, money or kids. *Id.* at 99 – Ex. B. They were happily married, according to Conrad. *Id.* at 72 – Ex. B.

## Heidy's family and friends

44. Heidy was the baby of the family. *See* Wagner, 2nd Trial, Vol. XI, p. 77 – Ex. T. She had a great relationship with her mother. *Id.* at 77 – Ex. T. Heidy loved her family and was close to her siblings and friends. *Id.* at 83 – Ex. T.

45. Heidy's mother saw her a lot during the last year of Heidy's life. *Id.* at 80 – Ex. T. They celebrated birthdays as a family. *Id.* at 81 – Ex. T. Heidy's mother stopped by her home about a week before Heidy was killed. *Id.* at 82 – Ex. T. Heidy showed her mother some new tricks that her dogs had learned. *Id.* They ordered pizza and breadsticks. *Id.* at 84 – Ex. T. Heidy was good. *Id.*

46. Heidy and her mother talked about taking Heidy's sister to a haunted house for her birthday in October. *Id.* at 83 – Ex. T. Heidy and her mother planned on going to San Diego for Heidy's birthday in March. *Id.* at 84 – Ex. T.

47. According to Heidy's mother, Heidy was not a depressed or sad person. *Id.* Heidy never saw a mental health doctor or therapist, to her mother's knowledge. *Id.*

48. Heidy's sister testified that Heidy was fun and energetic. *See* Rachael Wagner, 2nd Trial, Vol. VI, p. 185 – Ex. U. She was always having fun and smiling. *Id.* She was a hard worker. *Id.*

49. Heidy loved her nieces and nephews. *Id.* Heidy lived with her sister for a period of time. *Id.* Heidy stayed in touch with her sister after she moved out and got married. *Id.*

50. Heidy's sister was involved in preparing for Heidy's wedding. *Id*. at 187 – Ex. U. Heidy drove to her sister's home after Heidy bought her new car, to give her sister a ride in it. *Id*.

51. The month before Heidy died, she and her sisters took a day trip into the mountains for a hike. *Id*. at 190 – Ex. U. Heidy had set the outing up. *Id*. She liked the outdoors. *Id*.

52. One of Heidy's long-time friends testified that she communicated with Heidy two or three weeks before her death. *See* Belding, 2nd Trial, Vol. X, 142-144 – Ex. O. Her friend did not note any depression or sadness. *Id*.

53. Another long-time friend testified that Heidy was happy, fun loving, determined and spicy. *See* Sanchez, Vol. XI, p. 10 – Ex T. She always had a smile on. *Id*. Heidy was excited about the new car she had purchased. *Id*. at 11-12 – Ex. T. Heidy was looking into getting into a new house. *Id*. at 12 – Ex. T. This friend saw that Heidy was fine and happy two days before she was shot. *Id*. She had not seen Heidy down for at least a year prior to her death. *Id*. at 13 – Ex. T.

### Heidy's Work

54. Heidy was a gas specialist at Air Liquide. *See* Wagner at 77 – Ex. T. She had been promoted at her job. *See* McBride, 2nd Trial, Vol. XI, pp. 35-36 – Ex. T. According to her supervisor, Heidy was a hard worker who always seemed happy. *Id*. at 36 – Ex. T. She did well on performance reviews. *Id*. at 37-38 – Ex. T. Her supervisor never had issues with her. *Id*. Heidy never performed poorly. *Id*. She interacted well with others at work. *Id*. Her supervisor never saw any indication of sadness or depression. *Id*.

55. Heidy's immediate supervisor described Heidy as a go-getter. *See* Hone, 2nd Trial, Vol. XI, pp. 49-50 – Ex. T. She was a leader on her team. *Id.* at 51 – Ex. T. She never isolated herself. *Id.* at 50-51 – Ex. T. He saw her the Friday before she died. *Id.* at 50 – Ex. T. Heidy was happy, joking around and having fun. *Id.* He never saw Heidy depressed or sad. *Id.* He was not aware of her having any mental health issues. *Id.* at 51 – Ex. T.

56. Heidy's coworker and friend described her as outgoing, headstrong and opinionated. Aitken, 2nd Trial, Vol. XI, p. 42 – Ex. T. He never saw her depressed or sad. *Id.* at 44 – Ex. T. He was not aware of any mental health issues she had. *Id.* He saw her a few days before she was killed and she seemed normal and happy. *Id.* at 45 – Ex. T.

57. Another friend and co-worker testified that Heidy always got her work done. *See* Sandra at 10 – Ex. T. She was happy with the new position she had been given. *Id.* She had plans for things she wanted to do at work. *Id.*

## Alcohol

58. Conrad testified that he and Heidy would drink together 3-5 days per week in the home. *See* Conrad Depo. at 63 – Ex. B. They would typically drink Makers Mark whiskey. *Id.* at 63 – Ex. B. Conrad claims that he and Heidy would each have 4-8 drinks between the hours of 5:00 p.m. and midnight. *Id.*

59. He claims that the drinks would make Heidy buzzed and relaxed and on very rare occasion, emotional or sad. *Id.* at 66 – Ex. B. He claims that Heidy would take a bath to relax when she was upset. *Id.* Conrad never thought Heidy might kill herself while drinking. *Id.* at 70 – Ex. B.

60. Conrad claims that the alcohol he drank would typically make him goofy, happy and upbeat. *Id.* at 72 – Ex. B. He denies that he ever became angry, furious or enraged while drinking alcohol. *Id.* at 73 – Ex. B. Conrad denies ever being so mad that he has been unable to completely control himself. *Id.* at 80-81 – Ex. B.

61. Conrad admits that Heidy did not drink any more alcohol on the night of the incident than she typically would consume with Conrad at home. *Id.* at 63 – Ex. B. Heidy's blood was drawn and tested on the night of the incident. *See* Palmer Declaration – Ex. V. The test revealed a BAC of only 0.07. *Id.* Her blood was negative for other drugs. *Id.*

62. Although some time elapsed between the time of the shooting and the time of the blood draw, Heidy's BAC at the time of the shooting was likely about 0.07 because the gunshot wound would have resulted in limited blood circulation to the liver and therefore, negligible burn off prior to official death. *Id.*

63. Conrad's blood was drawn at about 5:00 a.m. *Id.* Conrad testified that he started drinking at about 6:30 p.m. and that he did not drink after the 911 call at 10:59 p.m. *Id.* Conrad's BAC at the time of shooting was likely greater than .125 and possibly as high as .229. *Id.*

64. Alcohol can affect a person's judgement. *Id.* However, given Heidy's low BAC, the effect of alcohol on her judgment at the time of the shooting was likely minimal. *Id.* Given Conrad's BAC, it is more likely that Conrad's judgement was affected by alcohol at the time of shooting. *Id.*

**Guns**

65. Conrad owned 15 guns, which were stored all over the house. *See* Conrad Depo. at 116-117 and 229 – Ex. B. The silver-handled gun found on the table was his and the black-handled gun found on the floor was Heidy's. *Id.* at 118 – Ex. B. Conrad constantly carried his gun. *Id.* at 130-131 – Ex. B.

66. Heidy knew how to use her gun. *Id.* at 105 – Ex. B. She took a class to qualify for a concealed weapons permit. *Id.* at 106 – Ex. B. She could shoot a gun safely. *Id.* at 106-107 – Ex. B. She could safely walk around the house with a gun. *Id.* at 108 – Ex. B. She could safely load a gun, cock a gun and turn the safety on and off. *Id.*

67. Heidy had shot her gun various times prior to the night of the incident. *Id.* at 120-121 – Ex. B. Heidy was comfortable enough with her gun that she would keep a bullet in the chamber and a full magazine in the gun, with the safety on. *Id.* at 125 and 128 – Ex. B.

68. Conrad had shot Heidy's gun several times. *Id.* at 119 – Ex. B. Heidy's gun did not have any sort of "hair-trigger." *Id.* at 121-122 – Ex. B. The amount of force needed to pull the trigger of Heidy's gun felt the same as Conrad's gun. *Id.*

69. The Utah Bureau of Forensic Services tested the force required to pull the trigger of Heidy and Conrad's guns. *See* Trigger Pull Report – Exhibit W; and Bechaver at 163-165 – Ex. H. The test showed that the forces required to pull the triggers were both normal and similar to each other. *Id.*

### The day of the incident, according to Conrad

70. Heidy and Conrad woke up close to noon and went out for brunch. *See* Conrad Depo. at 131-132 – Ex. B. He ate a full meal. *Id.* at 133 – Ex. B. They went to K-Mart and then Target. *Id.*

71. They returned home at about 6:00 p.m., brought the groceries in and put them away. *Id.*
    at 134 – Ex. B. Conrad worked on his motorcycle and washed his Bronco. *Id.* at 134-
    135 – Ex. B. Conrad started drinking Makers Mark whiskey around 6:30 p.m. *Id.* at 137
    – Ex. B.

72. He and Heidy started watching Dexter right after 7:00 p.m. *Id.* at 140 – Ex. B. Conrad
    brought Heidy a drink of Makers Mark for the show. *Id.* at 138 – Ex. B. Dexter is about
    a psychopathic killer. *Id.* at 167 – Ex. B. Conrad had watched all six seasons. *Id.* In
    various episodes, Dexter kills someone and tries to cover it up. *Id.* at 168 – Ex. B

73. After Dexter, they watched another television show. *Id.* at 142 – Ex. B. Conrad
    continued to drink Markers Mark as the night went on. *Id.* Conrad testified that they ate
    chips while Heidy boiled eggs. *Id.*

74. Conrad claims that he heard yelling outside. *Id.* at 144 – Ex. B. As a result, he went
    outside with his dog and the silver-handled gun. *Id.* They lived in the middle of Orem,
    across the street from Trafalga Family Fun Center. *See* Lopez at 16 – Ex. G. The
    neighborhood was not a common area for troublemakers. *Id.*

75. After returning, Conrad suggested he and Heidy get another dog. *See* Conrad Depo. at
    146-147 – Ex. B. He and Heidy started looking at pictures of dogs together. *Id.* at 147
    and 153 – Ex. B. Conrad continued drinking while they looked at dogs and brought
    Heidy another drink. *Id.* at 152-153 – Ex. B.

76. Conrad testified that Heidy became a little upset while they talked about different dogs.
    *Id.* at 147 and 166 – Ex. B. Conrad testified that he is not sure what it was that made her
    upset. *Id.* at 148 – Ex. B. He denies talking about anything other than dogs. *Id.* He did

not say anything rude or upsetting. *Id.* at 162 – Ex. B. He does not recall anything he did or didn't do to make her upset. *Id.* at 151 – Ex. B.

77. Heidy decided to take a bath. *Id.* at 148 – Ex. B. While Heidy was in the bathtub, Conrad picked the lock and entered the bathroom. *Id.* at 153 – Ex. B. Although Conrad told law enforcement on the day of the incident that "I always fuck with her when she's in the tub" by picking the lock because "she doesn't like me to like look at her," he testified at deposition that the only reason he picked the lock that night was to check on her, look her in the eyes and tell her he loved her. *Id.* at 176 – Ex. B; and Station Interview Transcript at 28 – Ex. L.

78. Conrad claims that he was calm when he entered the bathroom. *See* Conrad Depo. at 190 – Ex. B. Heidy was laying naked in the water. *Id.* at 155 – Ex. B. He claimed for the first time at his deposition that Heidy looked "really emotional" in the bathtub and that it "was really scary." *Id.* at 179 – Ex. B. He claimed at his deposition that it was like Heidy had given up. *Id.* Heidy told him to "get out," which he did. *Id.* at 153 – Ex. B.

79. Conrad's phone records show that 33 minutes before the 911 call, Conrad visited the Illinois Lottery website on his phone. *See* Phone Log – Exhibit C. Conrad testified that he had purchased a lottery ticket for him and Heidy and was checking to see if they won. *See* Conrad Depo. at 279-280 – Ex. B.

80. Conrad's phone records show that he called Heidy 12 minutes before the 911 call. *Id.* at 183 – Ex. B. He claims that he called Heidy's cell phone while she was in the bathroom and left her a voicemail. *Id.* at 154 – Ex. B. He claims that the voicemail was all positive

21

and he just told her he loved her. *Id*. at 183 – Ex. B. However, no such voicemail was
recovered from Heidy's phone. *Id*.

81. Conrad claims that he was in the kitchen when the bathroom door opened and he heard a
"pop" noise that did not sound like a gun. *Id*. at 154-155 and 184 – Ex. B. Conrad
claims that he turned toward the sound and saw Heidy standing in the opening between
the hallway and the kitchen. *Id*. at 194 – Ex. B. Then Heidy fell to the ground. *Id*. at
195 – Ex. B.

82. Conrad denies seeing any gun. *Id*. at 203 – Ex. B. Conrad claims that he called 911 and
went into the bathroom to get a towel. *Id*. at 198 and 200-201 – Ex. B. Conrad claims
that he asked for a lawyer at the scene after law enforcement arrived. *Id*. at 236-237 –
Ex. B.

83. Conrad claims that he remained completely calm that night before hearing the gunshot.
*Id*. at 191 – Ex. B. He was "totally" and "definitely" in control of his faculties. *Id*. at 192
– Ex. B. He was not belligerent. *Id*. Conrad denies that there was any yelling or voices
raised between him and Heidy on the night of the incident. *Id*. at 35 and 160 – Ex. B. He
denies any swearing or name calling between them. *Id*. at 164 – Ex. B. He did not say
anything rude or upsetting to her that night. *Id*. at 162 – Ex. B. He denies saying
anything negative that night. *Id*. at 164-165 – Ex. B.

84. Heidy did not do anything or say anything mean to him either that night. *Id*. at 162 – Ex.
B. Conrad denies getting mad at all before Heidy was shot. *Id*. Conrad claims that it
was an ordinary night until Heidy became emotional for some reason. *Id*. at 166 – Ex. B.

It was so normal, according to Conrad, that he was never worried that Heidy might hurt herself. *Id.* at 191 – Ex. B.

85. Conrad claims that he did not consume any more alcohol on the night of the incident than he typically consumed while drinking at home. *Id.* at 157-159 – Ex. B. He claims that he was not any more drunk than normal. *Id.* at 157-158 – Ex. B. Conrad denies that alcohol had anything to do with the way he acted toward the 911 dispatcher, officers, EMTs and Victim's Advocate. *Id.* at 233-234 – Ex. B. He claims that the sole reason he acted the way he did was because of Heidy's condition. *Id.* at 233 – Ex. B.

86. Conrad denies that he shot her, hit her, struggled over the gun or encouraged her to pull the trigger that night. *Id.* at 282-283 – Ex. B.

### Additional evidence contradicting Conrad's story

87. Conrad denies any physical altercation with Heidy, but the medical examiner found bruises on Heidy's: (1) inside upper right arm; (2) back of right hand; (3) front of left thigh; (4) right thigh; (5) right shin; (6) inside of right knee; (7) left elbow; and (8) left forearm. *See* Leis at 16 – Ex. A. The bruises had a similar appearance and did not appear days old. *Id.* at 19-20 – Ex. A. Based on the appearance and color, the medical examiner testified that they could have occurred around the time Heidy was shot. *Id.*

88. Conrad told officers at the scene that Heidy came out of the bathroom, he heard the "pop" and she fell down. *See* Crook at 48-49 – Ex. F. He said on the 911 recording that: "She was in the shower, she came out of the shower and I heard a pop, and there's blood, and she's in blood." *See* Dispatch Transcript at 5 – Ex. E. However, Heidy kept her gun in the bedroom – not the bathroom. *See* Conrad Depo. at 130 – Ex. B. Conrad testified at

23

his deposition that a few minutes elapsed between the time that Heidy came out of the bathroom and the time he heard the pop. *Id.* at 189 – Ex. B.

89. Conrad testified that when Heidy was shot, he was over at the kitchen counter and she was standing in the opening between the dining room and hallway. *Id.* at 194-195 – Ex. B. However, Conrad told Heidy's sister that Heidy fell into his arms after she was shot. *See* Rachael Wagner at 195 – Ex. U.

90. Also, the medical examiner testified that Heidy would have gone unconscious and immediately fallen to the ground after sustaining the wound she sustained. *See* Leis at 46 and 52 – Ex. A. However, Heidy's head ended up within one foot of the top of the stairs, and not at the opening between the dining room and the hallway. *See* Crook at 17 – Ex. F.

91. Further, when Conrad returned to work after the incident, he told his benefits administrator that Heidy was shot in the bedroom. *See* Naccarato at 119 – Ex. O.

92. Conrad claims that Heidy pulled the trigger, but no identifiable finger prints could be found on the gun when it was tested. *See* Stipulation, 2nd Trial, Vol. XI, p. 91 – Ex. T; and Finger Print Report – Ex. X.

93. Conrad claims that the gunshot just sounded like a "pop." *See* Conrad Depo. at 154 – Ex. B. However, Conrad told his benefits administrator that he heard a loud bang. *See* Naccarato at 119 – Ex. O. Also, the gun was test fired after the incident and the test shooter wore ear protection because the sound is so loud that it will damage a person's ears. *See* Radmall, 2nd Trial, Vol. VIII, pp. 4 and 7 – Ex. Y.

94. Conrad also claims that Heidy was in the bathtub approximately 30 minutes prior to her

     death and that he picked the lock and witnessed her laying naked in the bathtub. *See*

     Conrad Depo. At 154-157 – Ex. B. However, officers who arrived on the scene testified

     that the tub was full of clear water that had appeared to be drawn for a bath, the water

     was clear and clean, and that the bathroom floor around the tub was dry. *See* Elias, 2nd

     Trial, Vol. I, pp.123-124 – Ex. D; McKown, 2nd Trial, Vol. II, pp.51, 194-195 – Ex. F;

     Livingston, 2nd Trial, Vol. III, pp. 200-201.

## Gunshot residue ("GSR")

95. The presence of GSR on a person's hand gives very limited information. *See* Cavaleri,

    2nd Trial, Vol. IX, pp. 7-8 – Ex. H.[7] At most, it means he handled a gun, fired a gun, was

    close to someone who fired a gun or touched a surface with GSR on it. *Id.* at 7-8 – Ex.

    H. Nothing else can be extrapolated from GSR. *Id.*

96. It is generally accepted in the science of GSR that (1) the presence of GSR on a gunshot

    victim can never prove if a shooting was a homicide or suicide; and (2) GSR particles are

    expected to be found on a victim who is shot at close range. *Id.* at 18-19 – Ex. H.

97. Gunshot residue was found on Heidy's right hand. *Id.* at 14-15 – Ex. H. However,

    individuals with a contact gunshot wound, by definition, have been in an environment

    with GSR. *Id.* at 10 – Ex. H. Thus, nothing can be learned from finding GSR on Heidy.

    *Id.* Further, an EMT testified that when he arrived at the home, Conrad was touching

---

[7] Dr. Cavaleri has 15 years of training in GSR. 3-4. He has done over 800 GSR tests. *Id.* He has given
presentations and been qualified as an expert in GSR. 4.

Heidy's right arm or hand. *See* Sneddon at 76 – Ex. I. GSR could have gotten on Heidy's hand from Conrad. *See* Leis at 29 – Ex. A; and Cavaleri at 7 – Ex. H.

98. The number and location of GSR particles on a person do not give additional information because the amount of GSR that gets on a hand varies even with the same gun. *See* Cavaleri at 11-12 – Ex. H. Thus, the number of particles on Heidy's hand is not helpful in determining if she shot the gun. *Id*. at 14-15 – Ex. H. Bystanders to a shooting could get that amount of GSR on their hands. *Id*. at 15 – Ex. H.

99. GSR cannot identify who shot a gun or what hand was used to shoot a gun. *Id*. at 11 – Ex. H. A person who shoots a gun may not end up with GSR on his hands. *Id*. Similarly, a person who commits suicide with a gun may test negative for GSR. *Id*. at 20 – Ex. H.

100. GSR naturally falls off a person's hands when he uses his hands. *Id*. at 6 and 12 – Ex. H. Washing hands is a simple way to remove GSR. *Id.* Testing has shown that washing hands washes off GSR. *Id.* at 6-7 – Ex. H.

101. No GSR was found on Conrad's hands. *Id*. at 13 – Ex. H. However, Conrad engaged in a variety of activities and washed his hands twice before he was tested for GSR. *See* Conrad Depo. at 244-245 – Ex. B.

102. Conrad suggested at the scene that the officers check his hands for gunshot residue. *Id*. at 241-242 – Ex. B. However, Conrad admits that when he went into the bathroom to get a towel after Heidy was shot, he could have washed his hands before law enforcement arrived. *Id*. at 247-248 – Ex. B. In fact, a photo shows there was some blood left in the bathroom sink. *See* Elias at 123 – Ex. D.

103. Also, Conrad had gotten blood all over his hands by the time he suggested GSR testing. *See* Crook at 58-59 – Ex. F. Blood can wash away GSR. *See* Leis at 29 – Ex. A; and Lopez at 28 – Ex. G. Thus, it is highly unlikely that GSR would be on Conrad's hands after they were covered in blood. *See* Lopez at 28 – Ex. G.

104. The medical examiner did not test for GSR because it is not very helpful. *See* Leis at 28 – Ex. A. The Utah State Crime Lab does not do GRS testing because GSR cannot show that a person fired a gun. *See* Henry, 2nd Trial, Vol. VII, p. 148 – Ex. A. In could only mean the person fired a gun, stood next to someone who fired a gun or handled something that had GSR on it. *Id*. at 145 – Ex. A. The FBI does not do GSR testing either. *Id*. at 148 – Ex. A.

**Conrad's failed attempts to dismiss the criminal case for insufficient evidence**

105. Before Conrad's first trial, Conrad's attorney opposed bindover at oral argument. *See* Minute Entry – Ex. Z. The criminal court rejected Conrad's argument and found that probable cause existed to try Conrad for murder. *Id*.

106. After a new trial had been granted based on a change in some evidence, Conrad filed a motion to dismiss the charges for insufficient evidence. *See* Motion to Dismiss – Ex. AA. The trial court denied the motion and denied a motion to reconsider the motion. *See* Orders – Exhibit BB.

107. Finally, Conrad moved to dismiss again during the second trial, after the State rested. *See* Motion, 2nd Trial, Vol. XI, p. 98 – Ex. T. Conrad's lawyer argued that the State failed "to produce believable evidence from which a reasonable jury could conclude

that every element of the crime charged based on the evidence before the court now has been established beyond a reasonable doubt." *Id.* at 98 – Ex. T

108.     As the trial court had done several times previously, it held that sufficient

evidence existed upon which the jury could find Conrad committed murder beyond a

reasonable doubt. The court stated:

> he is under the influence of alcohol, making some pretty severe threats to the 911
> operator when he calls in and that state of mind could indicate, also indicate intent
> which would back up an act of intentional shooting. And so I think based, at a
> minimum on those factors, the Court is going to deny the motion to dismiss the
> murder charge.

*Id.* at 120 – Ex. T.

## RESPONSE TO CONRAD'S "STATEMENT OF UNDISPUTED MATERIAL FACTS"

2.     In the event of Heidy's death, the Policies provided for benefits. *See*
Interpleader Complaint, ¶8, and Conrad Truman's Answer to Complaint, ¶8.
**RESPONSE:** Janet objects to Conrad's reliance on pleadings that were not filed by Janet

because they are not admissible as against Janet. Also, this fact is disputed in part. The policies

had exclusions for suicide. *See* Naccarato at 138 – Ex. O; and Insurance Policy Exclusions – Ex.

CC.

12. Wagner's Cross-Claim is based primarily on the fact that Conrad was found
guilty of first degree murder and obstruction of justice on October 22, 2014. *Id.* at
¶¶ 33-34, 38-39, 44-45, 50.

**RESPONSE:** Disputed. Janet's cross-claim alleges that Conrad shot and killed Heidy. *See*

Wagner's Answer and Amended Crossclaims at 5. The Crossclaims seek a finding that Conrad

committed a disqualifying homicide pursuant to Utah Code § 75-2-803, which (1) prevents

Conrad from recovering insurance benefits arising out of Heidy's death if he committed any

felony homicide; and (2) allows Janet to ask the Court to determine whether Conrad committed a

felony homicide by a preponderance of the evidence. *See* Wagner Answer and Amended

Crossclaim at 9.

> 19. During his deposition, Conrad testified, 'I believe [Heidy] shot herself. I know
> I would never shoot her and I know I didn't shoot her.' *Id.* at p. 257.

**RESPONSE:** Janet admits that Conrad gave this testimony, but disputes that it is true based on

the facts identified in Janet's Statement of Additional Material Facts, above, and the evidence

cited to support said facts, which is contained in the Appendix of Evidence in Opposition to

Motion for Summary Judgment.

> 21. During Wagner 's deposition, Conrad's counsel asked Wagner to identify the
> evidence she believes supports a contention that Conrad intentionally killed
> Heidy. Wagner responded, 'It has to do with my daughter and who I know her to
> be and the fact that I know that she would never take her life. She had no signs of
> any depression. And so nothing else made sense. The contact wound to her head,
> her being naked, all of those things, to me, pointed to homicide.' *Id.* at p. 112.

**RESPONSE:** Objection, Janet's counsel objected to the question because it was overly broad.

*See* Janet Depo at 112, Ex. 3 to Appendix of Evidence to Motion for Summary Judgment. Also,

disputed in part. Janet admits that she gave this testimony, but also refers the Court to the

Statement of Additional Material Facts, above, and the evidence cited to support said facts,

which is contained in the Appendix of Evidence in Opposition to Motion for Summary

Judgment.

> 22. In Wagner's Initial Disclosures in this action, she identified numerous
> witnesses, but provided no information respecting their anticipated testimony
> other than that they would "have information concerning issues testified to at
> trial." *See* Plaintiffs Rule 26 Initial Disclosures, attached hereto as Exhibit 4.

**RESPONSE:** Disputed in part. Janet identified witnesses who had already testified at one or

two of Conrad's criminal trials. *See* Plaintiff's Rule 26 Initial Disclosures, Ex. 4 to Appendix of

Evidence to Motion for Summary Judgment; and Index, Appendix of Evidence in Opposition to

Motion for Summary Judgment. Conrad was already in possession of the trial transcripts and or

the trial audio recordings. *See* Janet Wagner's Answers and Responses to Conrad Truman's

Interrogatories and Requests for Production of Documents, Ex. 5 to Appendix of Evidence to

Motion for Summary Judgment. That is why Janet summarized the discoverable information the

witnesses might have as the information they "testified to at trial." *See* Plaintiff's Rule 26 Initial

Disclosures, Ex. 4 to Appendix of Evidence to Motion for Summary Judgment

> 23. In Wagner's Answers and Responses to Conrad Truman's First Set of
> Interrogatories and Request for Production of Documents, she failed and/or
> refused to provide any reference to any "evidence [she] ha[s] or know[s] about
> that supports [her] position that it was Conrad Truman who shot Heidy Truman in
> the head in 2012." *See* Response to Interrogatory No. 3, Janet Wagner's Answers
> and Responses to Conrad Truman's First Set of Interrogatories and Requests for
> Production of Documents, attached hereto as Exhibit 5.

**RESPONSE:** Objection, Janet made several objections to Conrad's interrogatory. Among other

things, Conrad's interrogatory was overly broad and unduly burdensome because it asked Janet

to identify all of the many facts she identified in her Statement of Additional Material Facts,

above. *See* Janet Wagner's Answers and Responses to Conrad Truman's Interrogatories and

Requests for Production of Documents, Ex. 5 to Appendix of Evidence to Motion for Summary

Judgment. Conrad never moved to compel a more precise response.

Further, in response to the interrogatory, Janet specifically referred Conrad to the

testimony on the audio recordings of the two criminal trials and attached the audio recordings to

her discovery responses.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when the undisputed facts "show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). An issue is genuine if it is such that a reasonable jury could

return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether to grant summary judgment, courts analyze the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Ortiz v. Norton,* 254 F.3d 889, 893 (10th Cir. 2001). "All bona fide factual disputes are to be decided by the triers of fact....Thus, a summary judgment, like a directed verdict, is unwarranted unless the court is convinced from the proof that the jury could arrive at but one conclusion..." *Lopez v. Denver & Rio Grande Western Railroad Co.*, 277 F.2d 830, 832 (10th Cir. 1960).

Causation generally cannot be resolved as a matter of law because causation is a highly fact-sensitive element of any cause of action. *Kilpatrick v. Wiley, Rein & Fielding,* 909 P.2d 1283, 1292 (Utah Ct. App. 1996). Causation is an issue of fact and thus courts refuse to take it from the jury if there is any evidence upon which a reasonable jury could infer causation. *Tabor v. Metal Ware Corp.*, 2008 WL 4250049, *6 (D. Utah Sept. 9, 2008). Utah litigants do not easily dispose of the element of causation on summary judgment. *Id.*

Here, genuine issues of material fact exist regarding the cause of Heidy's death. The differing jury verdicts in the criminal cases against Conrad Truman, which required a finding of guilt beyond a reasonable doubt, demonstrate that the fact finder here could certainly find that Conrad killed Heidy, especially in light of the preponderance of the evidence standard required. The issue of whether Conrad killed Heidy is of paramount importance to resolving this case and is also highly-fact sensitive and hotly disputed, and thus should be decided at the trial of this matter and not on summary judgment.

## ARGUMENT

## I.     THE COURT SHOULD DENY CONRAD'S MOTION BECAUSE (A) CONRAD CANNOT RECEIVE THE INSURANCE PROCEEDS IF HE

### KILLED HEIDY; AND (B) THERE ARE ISSUES OF FACT AS TO WHETHER CONRAD KILLED HEIDY

#### A. Conrad cannot receive the insurance proceeds if he killed Heidy

A person who commits a "disqualifying homicide" is prohibited from receiving insurance benefits that are paid as a result of the decedent's death. Utah Code § 75-2-803. "The court, upon the petition of an interested person, shall determine whether, under the preponderance of evidence standard, the individual has committed a disqualifying homicide of the decedent." Utah Code § 75-2-803(7).

"'Disqualifying homicide' means a homicide established by a preponderance of the evidence that meets the elements of any felony homicide[.]" Utah Code § 75-2-803(1)(b). Even manslaughter is a felony homicide. *See* Utah Code § 75-2-803(1)(b). A person is guilty of manslaughter if he "recklessly causes the death of another[.]" *Id.*

#### B. There are issues of fact as to whether Conrad recklessly caused Heidy's death

It is undisputed that Heidy died of a contact gunshot wound. *See* Janet's Appendix of Evidence ("Janet's AOE"), Ex. A, Leis, 2nd Trial, Volume VII, pp.30, 37-38. Conrad admits that either he pulled the trigger or Heidy did because not one else was around. Ex. B, Conrad Depo at 257.

There is no reason to believe that Heidy would spontaneously shoot herself. According to Conrad, nothing volatile happened that night. Ex. K, Hospital Interview Transcript, at 11-12. It was an ordinary night at home, according to Conrad. *Id.* She was not intoxicated. Ex. B, Conrad Depo at 63; *See also* Ex. V, Palmer Declaration. She was not on drugs or medication. Ex. K, Hospital Interview Transcript, at 16. She had no history of mental illness, self-harming, suicidal

ideation or suicide attempts. *Id.* at 15-22. She had never been to a mental health therapist or taken medication for mental health because she never needed it. *Id.* She was not crazy. *Id.*

Further, there is no reason to believe that Heidy planned to shoot herself. She was completely naked, in the kitchen, in front of her husband. Ex. D, Elias, 2nd Trial, Vol. I, pp.112-113. She had a great job, future plans and close relationships with her mother, sisters and nephews. Ex. T, McBride/Wagner, 2nd Trial, Vol. XI, pp 35-38; 77, 80-84. According to Conrad, she had a wonderful marriage to a wonderful guy. In sum, Heidy had none of the risk factors for suicide and many protective factors against suicide.

Moreover, the only person present when she was shot (Conrad) told police officers over and over again that Heidy would never shoot herself. Ex. K, Hospital Interview Transcript, at 11-12. Conrad even testified to this under oath at his first trial. Ex. B, Conrad's Depo, p. 256.

That said, Heidy probably didn't shoot herself. That leaves only Conrad. Conrad was out of his mind on the 911 call and at the scene. He threatened to kill the 911 operator, police officers and paramedics. Ex. F, Crook, 2nd Trial, Vol. II, pp. 27-29; *See also* Ex. D, Elias, 2nd Trial, Vol. 1, pp. 113-114. He yelled at his gun, in hatred. Ex. F, Crook/McKown, 2nd Trial, Vol. II, pp. 34-35, 190. Those at the scene felt legitimately afraid of Conrad in his state. *Id.*

Conrad claims he acted the way he did because Heidy was injured. However, there is no logical link between Heidy being injured and Conrad threatening to kill those who are trying to help Heidy. It would be understandable for Conrad to be distressed, sad, upset and under a sense of urgency. However, exhibiting rage and making death threats is not a natural or expected response to a loved one being injured. It is for the finder of fact to assess Conrad's credibility and determine why Conrad acted the way he did. *See United States v. Gamez-Acuna*, 375 F.

33

App'x 809, 815–16 (10th Cir. 2010) (holding in drug conviction case that it was for jury to decide whether defendant's "nervousness, evasiveness and false documentation" was "attributable to his status as an illegal alien" or "to the presence of drugs in the Nissan," even though Defendant testified that his nervousness, evasiveness and falls documentation was because he was illegal).

Apart from Conrad's violent state of mind, Conrad was very intoxicated. *See* Janet's AOE, Ex. V, Palmer Declaration. This likely affected his judgment. As a result, it is much more likely that Conrad killed Heidy. *See United States v. Fingado*, 934 F.2d 1163, 1167 (10th Cir. 1991) ("Circumstantial evidence alone may be sufficient to sustain a conviction").

Further, Conrad's denial lacks credibility and should therefore be rejected. See *Allen v. United States*, 164 U.S. 492, 499–500, 17 S. Ct. 154, 157, 41 L. Ed. 528 (1896) (upholding instruction to jury that it should "disregard evidence that was found to be false" and that "false testimony, knowingly and purposely invoked by defendant, might be used against him"); *Hovhannisyan v. Mukasey*, 274 F. App'x 609, 612 (10th Cir. 2008) ("A witness who is found not to be credible on one claim may be treated as not credible on others") (citing *Hattem v. United States,* 283 F.2d 339, 343 (9th Cir.1960) (stating witness' false testimony on one material fact authorizes trier of fact to disregard all of witness' testimony); *United States v. Sain*, 145 F.3d 1347 (10th Cir. 1998) (upholding jury instruction that said: "If you believe that any witness has willfully testified falsely as to any material fact, you may disregard the whole or any part of his testimony; but you are not bound to believe or disbelieve all the testimony of any witnesses"); *United States v. Fischer*, 76 F.3d 393 (10th Cir. 1996) (holding evidence was sufficient to sustained conviction even though defendant testified that he did not knowingly or

willfully commit the crime, in part, because "the jury did not believe [defendant], which was their prerogative, of course")

He suggested a third person killed Heidy when there was no one else around. *See* Janet's AOE, Ex. F, Crook, 2nd Trial, Vol. II, pp. 51, 104. He suggested she was shot through the bathroom wall or window, but there were no bullet holes. *Id.*

Conrad told law enforcement and the 911 operator that he heard the shot as Heidy came out of the bathroom. *Id.* at 48-49. However, Heidy kept her gun in the bedroom. Ex. B, Conrad Depo. 130. Accordingly, Conrad testified at his deposition that a few minutes passed between the time she left the bathroom and the time of the shooting. *Id.* at 189.

Conrad said he caught Heidy as she fell even though he testified that he was across the kitchen from Heidy when she was shot. Ex. U, Rachel Wagner, p. 195. Conrad testified that Heidy was shot in the entryway between the hall and the dining room. Ex. B, Conrad Depo. 194-95. However, Heidy ended up with her head close to the top of the stairs even though the gunshot wound would have caused her to go unconscious immediately. *See* Ex. A, Leis, at 46-52; Ex. F, Crook, 17. Also, Conrad told someone else that Heidy was shot in the bedroom. Ex. O, Naccarato, 119.

After the night of the incident, Conrad told Heidy's friends and the police that Heidy's death was an accident. Ex. M, Facebook Messages; Ex. N, Phone Call Recording, 1st Trial, Vol. X, p.3. He applied for "accidental" death insurance benefits and told the insurer that Heidy was shot by accident. Ex. P, Claim Forms.

Conrad's lawyer argued that Heidy's death was an accident at his first trial. Ex. B, p. 282. After he lost, Conrad hired a new lawyer, who argued Heidy's death was a suicide at the

second trial. *Id.* Conrad has adopted that position in this case, even though he has denied she would commit suicide many times, there is no explanation whatsoever for why Heidy would shoot herself and the insurance policies that have paid the money at issue all have exclusions for suicide. Ex. CC, Insurance Policy Exclusions. Perhaps most absurd is Conrad's claim that nothing unusual happened that night. Conrad testified that he has never physically hurt his wife, but the medical examiner found bruises on Heidy's arm, hand, thighs, shin, knee, elbow and forearm. Ex. A, Leis, at 16. The medical examiner testified that the bruises could have occurred around the time that Heidy was shot and did not appear to be days old. *Id.* at 19-20. Conrad also testified that Heidy was talking a bath prior to her death and that he picked the bathroom lock and witnessed her in the tub. Ex. B, Conrad Depo, p. 155. However, the detectives and police officers testified that when they arrived, the tub was full of clean, clear water that appeared to have been freshly drawn for a bath and the floor around the tub was dry, indicating that Heidy did not take a bath as Conrad claims. Ex. D, pp. 123-24; Ex. F, pp. 194-195; Ex. I, pp. 200-201. Conrad's version of events that Heidy got out of the bath and calmly walked out of the bathroom, completely naked, without saying anything as she shot herself in the hallway, with her body, blood and organic matter ending up close to the stairs, is unlikely considering the evidence.

In light of the foregoing, it is no wonder that the criminal court repeatedly denied Conrad's attempts to dismiss the criminal case. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *See Anderson*, 106 S. Ct. at 2513. Even though the State had to prove its case beyond a reasonable doubt and had to prove murder rather than just manslaughter, the court allowed Conrad to be

36

tried twice. Surely, if a reasonable jury could find that Conrad murdered Heidy beyond a reasonable doubt, the Court could find that Conrad recklessly caused Heidy's death by a preponderance of the evidence. *See United States v. Bowman*, 89 F.3d 851 (10th Cir. 1996) (to decide whether there is sufficient evidence for a conviction, the courts ask "only whether, taking the evidence-both direct and circumstantial, together with the reasonable inferences to be drawn therefrom-in the light most favorable to the [prosecution], a reasonable jury could find the defendant guilty beyond a reasonable doubt"). The only significant changes in the evidence since the criminal case is that Janet has retained a toxicology expert and Conrad has given a deposition. Both of these have strengthened the case against Conrad.

An examination of other cases illustrates why there is clearly enough evidence on which a reasonable jury or judge could find that Conrad killed Heidy by a preponderance of the evidence. In *State v. Brown*, the defendant appealed her aggravated murder conviction based on sufficiency of the evidence. 948 P.2d 337, 339 (Utah 1997). When the police arrived, they found the defendant distraught. The body of the victim, the defendant's boss, was inside his bed with gunshot wounds to the head. The gun used in the murder was never found. There were small traces of blood and a handprint on the front door, but this was not matched to the defendant. No blood was found on her clothes. No physical evidence linking the defendant to the murder was ever discovered. Defendant voluntarily submitted to a polygraph test, in which she denied any involvement in the victim's death. *Id.* at 340. Police found missing checks written to the defendant by the victim, and suspected that the checks payable to the defendant were forgeries. *Id.* at 345. No alibi was found for the defendant's whereabouts during the timeframe that investigators believed the shooting had occurred. *Id.* at 340. The defendant

cooperated with investigators and was interviewed by police more than twenty times and always denied involvement. *Id.*

The court nevertheless found that a reasonable jury could find, beyond a reasonable doubt, that the defendant killed the victim because: (1) whoever gained access to the house had a key, and the only two keys were in the possession of the victim and the defendant, (2) the defendant was familiar with the victim's home because she had been there before, (3) she had no alibi during the timeframe of the murder, (4) defendant gave inconsistent statements to the police regarding leaving soup outside the victim's front door; and (5) defendant had a financial motive to kill the victim before he reported her forgeries to the police. *Id.* at 344-46.

Similarly, in *State v. Worthen,* the Utah Supreme Court upheld a second-degree murder conviction in which the defendant was convicted of murdering his three-year-old stepdaughter. 765 P.2d 839, 850 (Utah 1988). The medical examiner opined that the child died from a severed duodenum and that the injury occurred approximately twelve hours prior to her death, which is when the step-father was alone with the child. There was conflicting testimony from another expert that the injury actually occurred seventy-two hours prior to the child's death. The Utah Supreme Court nevertheless found that the evidence was sufficient to justify the jury's verdict even though there was no evidence as to when the fatal blow was struck or who struck it, and although there was evidence that the child had a history of being abused, there was no evidence as to who actually abused the child. *Id.*

The Utah Supreme Court upheld these convictions beyond a reasonable doubt based on far less circumstantial evidence than exists in the instant case. Other jurisdictions have done the same. For instance, in *Branch v. Yates,* the defendant husband was convicted of murdering his

wife. 2010 WL 4630258, at *1 (E.D. Cal. Nov. 8, 2010). The wife was found in her bed with a single gunshot wound to her head. The husband made inconsistent statements by initially telling the police that he found his wife in the bed after she had already died and then later told the police that as he walked in, she was holding a gun to her head, and that the gun went off when he tried to grab the gun away from her. *Id.* at *2. Toxicology reports indicated that she had a substantial amount of Valium in her system, the prescription for which belonged to the defendant. *Id.* at *6. A police officer also testified that in his experience, he has seen only two cases in which a woman used a firearm to commit suicide and every woman had left a suicide note. *Id.* at *7. No note was left by the victim. Testimony from her family revealed that she was happy and had exhibited no suicidal tendencies. The court concluded that there was sufficient circumstantial evidence at trial from which a rational trier of fact could find the husband guilty beyond a reasonable doubt. *Id.* at *7.

Apart from criminal cases, courts in analogous civil cases have denied summary judgment based on far less evidence than exists in the case at hand. For example, in *Hulsey v. Protective Life Ins. Co.*, the life insurance company moved for summary judgment, arguing that the insured committed suicide, and therefore his wife was barred from recovery under the suicide exclusion clause of the policy. 2009 WL 10668556, at *1 (N.D. Ga. July 14, 2009). The husband was found dead in his truck from a gunshot to the head. *Id.* at *2. The sheriff's office, the autopsy and the death certificate all concluded the death was a suicide. *Id.* There was also evidence that the decedent was in financial trouble, that he knew his wife had an affair, and that he was on medication for anxiety and sleeplessness. *Id.* at *4. However, no gun was found at the scene and an expert testified that the location of blood in the truck and on the door seal of the

truck indicated that the door could have been opened, an object with blood on it removed and the door shut back after the fatal shot was fired. *Id.* at * 3. The sheriff's office and medical examiner maintained that these facts were still consistent with their determination that the death was a suicide. *Id.* at * 4. The court denied summary judgment and held that when the facts were viewed in the light most favorable to the wife, they were sufficient for a reasonable jury to find that the death was a homicide, despite the numerous official reports and findings that the death was a suicide.

Similarly, in *MacKenzie v. Mutual Ben. Life Ins. Co.*, the plaintiff wife sought to recover life insurance benefits after her husband fell out of a hotel window. 528 P.2d 150 (Utah 1974). No one witnessed the husband falling or jumping out of the window, but some witnesses did notice he was behaving erratically prior to his death. *Id.* at 151. The Utah Supreme Court upheld the trial court's finding that the husband did not commit suicide because he was mentally deranged when he fell and not bent on self-destruction *Id.* The Utah Supreme Court held that the insurance company failed to meet its burden to show that the husband committed suicide. *Id.*

## CONCLUSION

Based on the foregoing, the Court should deny Conrad's motion for summary judgment. Respectfully submitted on December 12, 2018.

**EISENBERG GILCHRIST & CUTT**


/s/ Eric S. Olson
Eric S. Olson

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of December, 2018, the foregoing **JANET**

**WAGNER'S MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY**

**JUDGMENT** was served on the following by the method below:

Lincoln W. Hobbs
Sarah H. Orme                 __X__ Electronic Filing
Hobbs & Olson Carpenter Hazelwood    _____ Email
466 East 500 South, Suite 300         _____ Facsimile
Salt Lake City, UT 84111            _____ US Mail
                                        _____ Hand Delivery

Mark R. Moffat                  __X__ Electronic Filing
Ann Marie Taliaferro            _____ Email
Brown, Bradshaw & Moffat       _____ Facsimile
422 North 300 West              _____ US Mail
Salt Lake City, UT 84103            _____ Hand Delivery

*/s/ Cheryl Miller*